IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:21CR202 SRC ) |
| GLENDA SEIM | ) ) |
| Defendant. | ) ) |

### MOTION FOR DOWNWARD VARIANCE

Isolation…………Loneliness…………Facebook.

Glenda Seim is no stranger to feeling isolated and lonely. She grew up an only child isolated on a farm. Her mother and father had a tumultuous relationship with each other and did not show Glenda much love or affection. Her parents were under financial stress most of the time and moved from the farm to the city chasing jobs to make money. Glenda felt out of place at the farm and in the city and had difficulty making friends. When asked by the probation officer to describe her childhood, Glenda did so with sadness on her face and in her voice.

During high school, Seim became pregnant and relied upon her pregnancy to get away from her home. She married her first husband and they had two children together. Their youngest child, a daughter, died at age seven of leukemia. The loss of her child devastated her. Eventually, Seim and her husband divorced and Seim remarried after the divorce. Seim's second husband died in 2006.

1

Seim moved into the senior apartment complex after her second husband died. Although she was surrounded by people and opportunities to participate in social activities, Seim still had feelings of isolation and loneliness. She wanted to feel special and she wanted to feel loved. Seim had heard about Facebook as a forum to meet people. Seim had no idea about privacy settings and was completely naïve to the sinister individuals who trolled Facebook looking for potential victims who might fall prey to their evil financial schemes. Seim opened a Facebook account and Seim believes she also put a picture of herself on her Facebook page. In no time at all, Seim was contacted by lots of "friends".

In just a short time, Seim found herself "courted" by a wonderful, caring man named Wilson. He was so easy to talk to and she began telling him all about her life. Wilson said all the right things to her and he was so understanding and open with his feelings. He promised her a wonderful life together. He wanted her to help him raise his daughter. He convinced Seim to register a business with the Secretary of State so they would have a business to run together when they married. The "package" was everything she ever wanted in life, she was loved, and as Seim simply states it: She was important.

One day, Wilson told Seim he was taking a trip overseas. Seim didn't receive any emails from Wilson for almost a month. Then Wilson emails and tells her he is in trouble in Nigeria and needs assistance, ie, money, to return home. Seim begins doing the things he asks of her. Wilson manipulates her by withholding his affection when she questions his need for assistance by suggesting a simple, logical solution to his problem. This

2

manipulation pulls her back into the scheme. She does not want to be without Wilson. Wilson is her everything, Wilson is her life.

Wilson and his group manipulated and used Seim to carry out their fraudulent scheme for six years. Even when MoneyGram notified her that she was engaging in fraudulent activities, when bank managers notified her that checks were fraudulent and closed her accounts, when police officers knocked on her door and told her she was engaging in fraudulent activities, when federal agents visited her twice and told her she was in a romance scheme and she was involved in fraudulent activities, Seim ignored them and continued to ignore all the warnings signs. In the background, Wilson sweetly told Seim that all these people and agencies were mistaken and incorrect, to ignore them all, and that Seim was his true love and he needed her help. This group of evildoers was so very patient, manipulating Seim slowly and deliberately. They obviously took their time to learn about her life and her needs and most importantly, her weaknesses and vulnerabilities. They manipulated and brainwashed Seim into continuing fraudulent activities and believing them over anyone else, including law enforcement, bank representatives, family, and friends. This relationship was about to come to an abrupt end.

In 2021, Seim was charged with federal offenses relating to her fraudulent activities. Seim turned herself into the United States Marshals. Counsel was appointed. Discovery was voluminous. As Seim reviewed the discovery, the scheme began to unfold and she came to understand the part she played in the scheme. Today, Seim is filled with remorse for her actions and her role in the victimization of other individuals. She feels

terrible guilt and anguish for the hurt she has caused others. Seim is certainly not wealthy, but she is prepared to make restitution to the victims of the scheme.

Seim is eighty-one years old and suffers from a plethora of medical conditions as documented in the Presentence Investigation Report. (PSR, Paragraphs 52 – 53). She also has been diagnosed with mental health issues as documented in the Presentence Investigation Report. (PSR, Paragraphs 54 – 55), Seim has no history of substance abuse issues. (PSR, Paragraph 57).

In 2021, Counsel for Defendant referred Seim to Dr. Rick Scott for a psychological evaluation and risk assessment related to the charges in the Indictment. Counsel for Defendant has filed this risk assessment as a redacted document in compliance with the Court's order of February 11, 2022 and files this document as an attachment to this motion. Dr. Scott met with Seim and discussed her childhood, adulthood, marriages, children, education, employment, medical history, psychological history, and substance abuse history. An important part of the interview centered around Seim's discussion of her role in the fraudulent scheme: how and why she became involved with the person on line, why she did the things he asked her to do, why she refused to believe anyone who told her she was involved in a fraudulent scheme, and why she continued to involve herself with the person on line despite numerous warnings and "red flags." She acknowledged her role in the offense and expressed remorse and regret for her actions.

Dr. Scott also performed a risk assessment to determine whether Seim would present a risk for continued criminal conduct if the Court were to sentence her to a term of probation in this case. Dr. Scott determined, to a reasonable degree of psychological


probation in this case. Dr. Scott determined, to a reasonable degree of psychological certainty, that Seim would present a very low risk of violent criminality and a low risk for general criminality if the Court were to sentence her to a term of probation. Dr. Scott considered Seim's gender and age, her lack of any criminal history, her lack of a diagnosis of a major mental illness, and her lack of any substance abuse issues. Dr. Scott also considered Seim's stable life-history with respect to marriages and employment.

In his opinion, a term of supervision will be the significant factor that will reduce Seim's risk of recidivism. Seim will be under the supervision of a probation officer and subject to the many conditions of supervision. Seim will open her home and financial information to the probation officer. In addition, the probation officer will have the authority to search her home and computer, if any, if the officer has reasonable suspicion that she is involved in any criminal activities.

Seim respectfully requests this Court vary downward and sentence her to a term of five years probation. This sentence will satisfy all the 3553(a) factors in this case. The sentence will protect the public and most assuredly, deter Seim from committing any further crimes. It is a just sentence in this case and a sentence that will promote respect for the law. Almost one year has passed since the date of Seim's initial arrest on this federal Indictment. Seim turned herself into the United States Marshals and was released on bond. In reviewing the extensive discovery with Counsel, Seim came to understand the magnitude of this scheme, how she was victimized and how she victimized others. She has incredible remorse for what she did and regrets every day that she chose to believe the evildoers and continue her fraudulent activities instead of following the

advice of others and terminating her activities immediately. Seim assures the Court that she has learned a valuable and difficult life-lesson. She wants to move forward, make amends to the victims of the scheme, and assures the Court that she will never engage in this behavior again.

WHEREFORE, for the foregoing reasons, Glenda Seim respectfully requests that the Court grant this motion and sentence her to a term of probation.

Respectfully submitted,

/s/Lucille G. Liggett
LUCILLE G. LIGGETT, #34589MO
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Lucy_Liggett@fd.org

ATTORNEY FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Tracy Berry, Assistant United States Attorney.

/s/Lucille G. Liggett
LUCILLE G. LIGGETT, #34589MO
Assistant Federal Public Defender

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:21CR202 SRC ) |
| GLENDA SEIM | ) ) |
| Defendant. | ) ) |

# ATTACHMENT

# PSYCHOLOGICAL REPORT BY RICK SCOTT, PH.D.

# Scott Psychological Associates, LLC

*Rick Scott, Ph.D.*

## FORENSIC PSYCHOLOGICAL EVALUATION
### February 1, 2022

**Case Name:** United States of America v. Glenda Seim
**Cause No., Jurisdiction:** 4:21-CR00202-01 SRC, Eastern District of Missouri
**Examinee:** Glenda Seim
**DOB:** ▇▇/1940

### REFERRAL INFORMATION:

Glenda Seim is an 81-year-old woman referred for diagnostic evaluation and risk assessment related to charges of bank fraud and identity theft. Lucy Liggett, Assistant Federal Public Defender, represents Ms. Seim and retained the examiner. Tracy Berry is the Assistant United States Attorney. The case is being heard by the Honorable Stephen R. Clark, United States District Judge. At the time of the evaluation, Ms. Seim was on bond and residing in St. Louis County.

### SOURCES OF INFORMATION:

Agreement and Authorization for Expert and Other Services
Indictment
Protective orders and addendum (signed by the examiner)
Application for Warrant
Reports from the Federal Bureau of Investigation
Reports from the United States Secret Service
Reports from the Moline (Illinois) Police Department
Reports from the St. Louis County (Missouri) Police Department
Money Mule Letters to Ms. Seim from the United States Secret Service
Discovery documents including
    Records from financial institutions
    Records from telephone service providers
    Records from the United States Department of Education
    Records from the Arizona Department of Economic Security
    Records from Indiana Unemployment Insurance Benefits
    Records from the United States Small Business Administration
    Records from the United States Department of Housing in Urban Development
Presentence Investigation Report by Abigail J. Korte, U.S. Probation Officer
Records from Esse Health, D. Todd Hammond, M.D.
Records from SSM Health St. Mary's St. Louis
Records from SSM Health St. Clare Fenton
Medical problem list and list of medications provided by Ms. Seim
Interviews of Ms. Seim in the examiner's office on 08/19/21 (2.50 hours) and 09/08/21 (1.50 hours)
Dementia Rating Scale – 2nd Edition

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 2  
02/01/2022

Prior to interviewing Ms. Seim at each session, the examiner provided detailed admonishments regarding the purposes of the evaluation and the limits of confidentiality. Additionally, he discussed the limits of confidentiality related to mandated reporting and duty to warn. Ms. Seim had no questions about this information and agreed to participate in each interview and testing session.

## LEGAL STATUS:

Ms. Seim was charged by indictment with bank fraud based on allegations that between 08/16/15 and about 02/21/21, she aided and abetted other individuals and devised a scheme to obtain monies, funds, and assets owned by federally insured financial institutions by means of false and fraudulent pretenses and representations. She had participated in a scheme involving persons representing themselves to her as in need of her aid, from whom she obtained and transferred monies from various financial institutions, the Small Business Administration, and other state and federal agencies. On 05/26/20, local and federal law enforcement advised Ms. Seim and provided a money mule letter to her indicating that she would be subject to criminal prosecution if she continued to aid the fraudulent scheme. Subsequently, she then was charged with fraud for depositing a check in the amount of $100,000 into an account of a small business she created. This first count of the indictment will be dismissed at the time of sentencing.

Ms. Seim was also charged with three counts of identity theft related to the fraudulent scheme. Federal agents again advised her and provided a money mule letter explaining that she could have facilitated the transfer of money from the victims of crime to the perpetrators of the fraudulent scheme. She was told that she could be subject to criminal prosecution and could not "avoid legal responsibility by being willfully blind to the source of the funds" she transmitted. On 02/23/21, she again received funds in the form of prepaid debit cards for unemployment benefits that had been obtained illegally. On 11/02/21, Ms. Seim pled guilty to counts two and four, identity theft, while count three will be dismissed at the time of sentencing.

Given that Ms. Seim has entered a plea of guilty and anticipates sentencing on 02/10/22, the examiner will not provide a detailed law enforcement account of the conduct leading to charges. This information was outlined very well in the presentence investigation.

In the presentence investigation report of 01/06/22, Abigail J. Korte, U.S. Probation Officer, reported that as part of plea negotiations, sentencing guidelines were adjusted and the parties estimate a Total Offense Level of 21. The examiner was informed that Ms. Seim is eligible for probation and the present evaluation was undertaken to consider risk for violence criminality or general criminal recidivism, as well as for mitigation.

**Ms. Seim's Perceptions of the Offenses:** After her husband died in 2006 and she retired in 2008, Ms. Seim saw a consistent decline in her financial situation leading to her second application for bankruptcy in 2013. She failed to meet her payment plan and the bankruptcy was dismissed. Due to her financial limits, she had few options for a residence. After she moved into a subsidized senior apartment in 2012, she made few friends, but she had little regular socialization and was isolated. She recalled joining Facebook and, apparently, knew nothing about privacy settings, as she was quickly contacted by numerous individuals whom she did not know. Among these was the "man," Wilson William (also know to her as Dan William), with whom she formed a relationship.

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 3  
02/01/2022

The relationship developed through her financial support of Mr. William, who claimed to have suffered a severe injury during an assault and robbery in Nigeria. He asserted that he was trapped in the country with no passport, no money and significant debts for medical expenses. Ms. Seim initially pawned electronic devices provided by Mr. William or his associates, then began transferring funds by MoneyGram. In discussing these activities, she described being isolated and overwhelmed when she first developed the "relationship" that led to her participation in the scheme. She enjoyed having contact with someone and learning about his family, such as the daughter whom he said he was seeking on Facebook. Although she had considerable regret in retrospect, she fully believed his accounts of being trapped in Nigeria and having family whom she could meet. Ms. Seim found Mr. William to be "the most intriguing, intelligent individual I ever met. Very intelligent. Very kind." She also felt challenged and enthused by the tasks he gave her, such as pawning electronics or working with the financial institutions to "help" this man who was showing her such affection. With the promise of a romantic relationship and a daughter whom she would help raise, she was blind to the obvious elements of the scheme.

When challenged by the examiner about the stereotype of the Nigerian connection, Ms. Seim knew it was a "big red flag" for being victimized, but ignored it at the time. She also reported that Mr. William withdrew from her his affection and attention when she pressured him to use the United States Embassy or to seek other support as an American trapped abroad. She indicated that this was the only time he got mad at her, which caused her to fear losing the relationship. Mr. William had become so important that she dismissed signs that would have been obvious to others. For example, MoneyGram refused to provide service, saying she was engaged in a fraudulent scheme. Mr. William "always had an explanation" for her and she wanted to believe him. Financial institutions stopped allowing withdrawals, closed accounts and blocked payment on deposits. When pandemic relief funds became available, she participated in the application for a Small Business Administration loan, but the loan was denied. Ms. Seim reported that when she mentioned what she was doing to her acquaintances or family, her son told her it was a scam and that he did not want to hear about it. She said that led her to be more stubborn about things. She wanted to protect Mr. William, hoping to one day have a family with him and his daughter. He even convinced her that the daughter would come live with her in St. Louis and they would wait for him to get out of Nigeria together.

The examiner challenged Ms. Seim regarding statements she made. For example, taking care of these financial transactions became "normal daily living" for her. When the examiner observed that this was not normal, Ms. Seim reiterated that she "thought I was building a relationship that was going to work into something permanent." She also felt the push and pull of the relationship, wanting Mr. William to be happy with her, reacting when he was not, and buying into his detailed explanations for why the financial institutions and other people were creating problems. For example, Mr. William would insist that the checks were good and that the problem was with the banks. Being in this kind of special relationship affected her ability to judge his reasoning and cemented a bond between them.

Ms. Seim also commented that she was not hurting anyone and the examiner confronted that statement. She said that Mr. William convinced her that all of the people from whom they were getting money were friends or family of his. Some would talk to her on the phone and she was further convinced they were trying to help him. Obviously, she did not know who was really on these calls, but she believed what Mr. William told her. What she did not know was that real persons had their identities stolen, a fact which caused her significant distress when the examiner confronted the issue. She had her greatest doubts when she learned that applications were being made for unemployment in Arizona, because it did not fit the other elements of their

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 4  
02/01/2022

activities. She could not understand how this would help Mr. William pay his medical bills and afford to travel back to the United States.

As part of her own personal weaknesses, Ms. Seim was admittedly stubborn and reacted to perceived mistreatment by the local and Federal law enforcement officers who visited her. First, she rejected the idea that what she was doing was part of a fraudulent scheme, because that meant she would lose everything she had with Mr. William. Second, she felt that the local officers were arrogant and disrespectful in their treatment of her, leading her to react to them as though they were trying to be "hotshot" cops. This reaction did not serve her because it allowed her to dismiss what they said. Third, she felt accused when law enforcement dismissed her as being dishonest and that they did not believe she did not know it was a criminal scheme. Her reaction was to say, if they do not believe her, she will not believe them. Fourth and finally, she wanted to believe Mr. William. She told him about the officers visiting and giving her the mule letters. He reacted with sympathy and concern for her, never giving her the idea that the officers were right. As well, even after being instructed to discontinue contact with him, she could not bring herself to change her number. Ms. Seim hoped that Mr. William would stay in touch, but he did not. When the three prepaid cards arrived, leading to her arrest, she contacted him to inform him of the arrest (March 2021). He then ended their "relationship."

During the interviews, six and seven months after her arrest, respectively, Ms. Seim periodically slipped into discussing Mr. William in the present tense. The intensity of the relationship and its persistence over seven-plus years made it the most important aspect of her life. That she hardly benefited financially from her activities (keeping only small amounts of money to offset her expenses) and did not use the large sums to fund a more luxurious lifestyle did not matter to her. She was in a relationship with a man she considered to be her paramour, who was going to make her a part of his family and share her remaining years. In her presentation, there was significant evidence that she was grieving the loss of what, for her, was a real romantic relationship.

**PERTINENT HISTORY:**

Ms. Seim was born in Kimball, Missouri, the only child of Oscar and Irene Thomason. Shortly after she was born, her father was drafted and served in Europe in World War II. Her mother took her to Rolla, then to St. Louis, where they lived until her father returned from the service when she was about five years old. With her parents, she returned to the family farm, where she lived until she was about 14 years old. Her father needed work and the family came to the St. Louis area, spending fall and winter in the city, then returning to the farm for planting season. Ms. Seim indicated this occurred until 1957, when she got pregnant and married. After a few years, she moved to city where she remained until 2012, when she moved to the apartment in Kirkwood, Missouri.

Oscar Thomason, who died in 2009, was an aggressive man who did not tolerate differences of opinion. As well he was a strict and harsh parent, who was violent toward Ms. Seim when she was a child. She indicated that her father was quick to react aggressively over minor issues, such as not completing a task quickly enough, doing something irritating, or talking back. She reported that her mother was unable to stop him, but would yell at him while he was hitting their daughter. Irene Thomason was a poorly educated woman who was a homemaker and helped on the farm. Ms. Seim reported having a better relationship with her mother, though she upset her with backtalk and misbehavior. She mentioned that her mother did little to prepare her for adult life, such as teaching her about menstruation, pregnancy or

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 5  
02/01/2022

relationships. She denied that her father was physically abusive to her mother, though they had a very contentious relationship. Her mother tolerated her father and was involved in the community and church. After her mother died in 2000, Ms. Seim never reconciled her relationship with her father.

In terms of the family history, Ms. Seim offered that the Thomason family had serious mental health issues. She said that her father was one of 17 children, 14 of whom lived to adulthood. She stated that they were "all like my dad. Couldn't disagree with any of them," and suggested there was a lot of violence. Some members of the paternal family committed suicide, indicating a history of mood disorders. Ms. Seim described her maternal family as "backward. Uneducated." She then corrected herself, observing that male members of the family were able to go to college and that one uncle was a minister. Mood disorders were present in the maternal history as well, with one great uncle committing suicide. In terms of substance use, Ms. Seim commented that the paternal family were Southern Baptists, claiming to be "so against alcohol, but they all used to drink." She said that some of the paternal family members had legal difficulties. One uncle served time in prison; he was an alcoholic who committed suicide.

Ms. Seim was a product of a normal pregnancy, but extended labor and delivery (five days). She reported that she had no complications at birth or significant early medical problems. She knew of no delays in her early development and she required no assistance with motor development or speech. She recalled that as a school-aged child, she suffered serious cases of chickenpox and pertussis.

As noted, Ms. Seim was physically abused by her father, but not by her mother. She reported that the abuse stopped when she was 13 years old, after she stood up to her father as he threatened her mother. She recalled that she said that if he hit her mother, he would never see her again. She implied that she was disappointed in her mother for never standing up to him, as she did for her. Ms. Seim denied that others, such as teachers, were physically abusive. She said that she was socially inept, which led to being bullied, especially when in St. Louis. Ms. Seim reported that she was sexually abused in childhood on a few occasions. An uncle from California would visit the family for a couple weeks each year and would fondle her during these visits. She denied that he raped her, but he did "other things." No other adults molested her and she was never sexually assaulted by a peer as a child or teen. After she got pregnant in high school, her father "treated me like a loose woman... Got handsy... dirty old men in the country.'"

In terms of her education, Ms. Seim moved back-and-forth between schools, so she was in St. Louis for kindergarten, then in Kimball until early eighth grade when they return to St. Louis each year. Ultimately, she attended high school in Licking, Missouri, where she felt alienated from others. She commented that she was a "hayseed" in St. Louis, but a "bus kid" who traveled into Licking from the country. In 1957, she became pregnant with her first child and got married, so she withdrew from school. Ms. Seim reported that she tried a few times to earn her GED at community colleges, but had a very difficult time with learning and completing assignments. She eventually earned her GED in 1971, but had no further education.

Ms. Seim never served in the military. She began working after she left school at a restaurant in Licking, while her husband worked at a local factory. She miscarried the baby and continued to worked until they had their first child. While they lived in the country, she was home with the children. When the family moved to St. Louis in 1963, she began working for a hospital in the dietary department for a while. She left that job to work for a manufacturer, a job she held for nine years. In 1976, she and her husband divorced. She had a job at an ice cream parlor for three years until it was sold, then she moved among several jobs. Ms. Seim served as a unit

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 6  
02/01/2022

secretary at a hospital for five years, then in medical records at another hospital for seven years, being fired for absenteeism (due to severe headaches) in 1991. For the next several years, she moved among jobs, ultimately retiring after working for five years at a market research firm. She has been retired since 2008.

In terms of her psychosexual history, Ms. Seim identifies as heterosexual. She was married to Lloyd Freeze from 1957, when she was pregnant, until 1976, when they divorced. The couple lost the first pregnancy to miscarriage, which her mother said was "good because no one will know you were pregnant." She recalled that she wanted out of the house anyway, and she got pregnant again very soon. The couple had their first child, DeWayne, in 1958. A daughter, G▇▇ A▇▇ followed the next year, though she died of leukemia in October 1965. Discussing her daughter still caused Ms. Seim a strong emotional reaction. The couple stayed together until 1976, when they divorced. Ms. Seim admitted that she became dissatisfied, asked for a divorce but was denied, then left home. Mr. Freeze then filed for divorce and she accepted the terms of his petition. Her next relationship was with her second husband, Roland Seim, with whom she was involved shortly after her divorce; they married in 1983. The couple had no children and were together until he died in 2006. Ms. Seim suggested some regret at the choices she made. She has regular contact with her son, who lives nearby in St. Louis County. They meet each Thursday for breakfast, though he is not in a position to support her financially or with a place to live. Ms. Seim denied a history of being sexually assaulted as an adult. She has never been accused of sexually abusive behavior of an adult or child.

Ms. Seim is being treated for numerous medical problems by her primary care physician, Todd Hammond, M.D. She takes approximately 15 medications and supplements. The primary concerns at present are type II diabetes, hypertension, chronic kidney disease, and glaucoma and macular degeneration. She has had significant orthopedic problems, having undergone bilateral knee replacements and suffering chronic back pain and osteoporosis. She also suffers hyperlipidemia, urinary incontinence (treated with an implant), and hyperparathyroidism. With the examiner, Ms. Seim denied a history of head injury with concussion or loss of consciousness. She has never had seizures. In addition to orthopedic surgeries, she has had laser surgery to remove a cataract in her left eye and repair of a hiatal hernia. She reported that she is compliant with medications and receives routine medical care.

In terms of her psychiatric history, Ms. Seim has never been hospitalized for mental health care. She reported that she has never had outpatient psychiatric or psychological services. Dr. Hammond prescribes Wellbutrin for depression, trazodone for insomnia and aripiprazole, an antipsychotic used, for anxiety and mood stabilization. Ms. Seim recalled that the aripiprazole helps her to stay "cool, calm these days." She reported a history of a suicidal gesture in high school, when she took an overdose of aspirin because she was feeling distressed about her life. She has never attempted suicide since that time.

Ms. Seim denied a history of substance abuse. She has never consumed alcohol on a routine basis or had problems related alcohol use. She has never tried marijuana or other illicit drug. She denied that she has abused prescription medications or over-the-counter substances.

In terms of her legal history, Ms. Seim said she was never arrested prior to the present case. She reported that she was never in trouble with police is a juvenile. Records confirm no adult criminal arrests or convictions. Ms. Seim has twice declared bankruptcy, first in 1995, then in 2013. The latter bankruptcy was dismissed, because she did not comply with the payment plan. She denied that she has ever had an order of protection taken against her. She has no other legal matters pending.

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 7  
02/01/2022

## MENTAL STATUS EXAMINATION:

Ms. Seim is a medium height, average weight, white female, who presented to each evaluation session in clean, dress casual clothing. She has short gray hair that she had styled neatly and she wore eyeglasses. Overall, her hygiene was good and she appeared to take care in her appearance. Ms. Seim was cooperative with the evaluation, answering questions as asked, providing additional information as needed, and completing psychological testing. She exhibited no mannerisms or other idiosyncratic behaviors.

Ms. Seim was oriented to person, place and time. Her long-term memory was intact for personally relevant information and her general fund of knowledge was good. Her attention and concentration were fair. She had difficulties with tasks assessing concentration and she demonstrated some difficulty with distraction during the interviews (e.g., sequencing problems). She was, however, easily redirected to the topic at hand. When asked to define common proverbs, she gave accurate definitions to three of four, while the last response was concrete. In her responses to questions assessing social comprehension, she showed a good understanding of social mores and attention to the needs of others.

Ms. Seim spoke at a normal rate and tone. Her responses were logical, coherent and relevant to questions asked. She exhibited no signs of a formal thought disorder, such as tangentiality, circumstantiality or poverty of thought. Ms. Seim's affect was of a normal range. She was generally serious and pleasant during the sessions, but did express anger at her family and an irascible tone when discussing her early history. She exhibited no hostility or suspiciousness and her emotional tone was appropriate to the content of her speech.

When asked if she has a mental problem, Ms. Seim stated that she does, being "overwhelmed by daily living. I feel I don't have the resources, but I know, intellectually, I know I do. Emotionally I don't." She identified feeling isolated, anxious and worried, based upon chronic and acute concerns. She has been struggling financially for many years and feels that she does not have much emotional support either. She experiences anxiety about her long-term health. Acutely, she is facing a serious legal problem, has been evicted from her subsidized housing due to her arrest, and is anxious and uncertain about the future.

Ms. Seim acknowledged that she can be temperamental, comparing herself to others in her family who are easily irritated by other people. She reflected on this with humor, suggesting awareness of the tendency and having insight about it. She does not have significant difficulties with verbal aggression or violence, but can be irascible and sarcastic. Ms. Seim denied suicidal ideation and plans. She also denied homicidal or assaultive ideation.

In terms of mood symptoms, Ms. Seim did not endorse feeling sad or having little interest in usual activities. Her medications help her sleep and to remain generally calm and emotionally stable. She has a good appetite and adequate energy for her daily activities, given her medical conditions and age. Ms. Seim demonstrated no signs of mania, such as expansive or euphoric mood, racing thoughts or decreased need for sleep. She has mixed self-esteem and is cautiously optimistic about her future.

Ms. Seim is not psychotic. She does not experience auditory or visual hallucinations. She did not voice any delusional beliefs, such as ideas of reference, thought broadcasting,

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 8  
02/01/2022

thought control, or persecutory or grandiose delusions. She has no history of thought disorder, perceptual distortions or affective disturbances consistent with psychosis.

In terms of anxiety symptoms, Ms. Seim experiences situationally-based nervousness, irritability and uncertainty. She did not endorse panic attacks or generalized anxiety unrelated to specific circumstances. As noted, her health and finances cause chronic worry and her housing and legal situations are associated with more acute anxiety. Ms. Seim exhibited no signs of irrational obsessions, though she does ruminate about her current problems. As well, she exhibits no compulsions or other ritualistic behavior. Although she experienced trauma in childhood, including both physical abuse and sexual molestation, she does not experience intrusive memories or other experiences consistent with posttraumatic stress. Perhaps as a function of the aripiprazole, Ms. Seim exhibited no acute anxiety during the interviews.

Ms. Seim's clinical insight and judgment are fair. She appreciates the seriousness of both her medical and emotional problems, and she is consistent in her compliance with treatment. She knows she showed extremely poor judgment in her relationship with Mr. William, her dismissal of concerns voiced by others, and her rejection of notifications from financial institutions and law enforcement that she was engaging in fraud. Ms. Seim is attempting to reconcile her ability to trust others and to make better judgments in her relationships.

**PSYCHOLOGICAL TESTING:**

The examiner administered the Dementia Rating Scale – 2nd Edition (DRS-2) to evaluate Ms. Seim's cognitive functioning in light of her age and chronic medical problems (esp., hypertension and diabetes) to determine if she has begun to decline cognitively. The DRS-2 is a multiscale measure of general cognitive abilities that is normed for individuals aged 56 to 105.

Ms. Seim completed all scales on the DRS-2 and did so without requiring repeated instructions, assistance with the tasks, or a break. She appeared to make good effort and her results were consistent with observations made three weeks later during the mental status examination. Therefore, the results are valid. On the DRS-2, Ms. Seim scored consistently at or just below average for each scale. She performed in the average range (41st to 59th percentile) in terms of her memory and her construction capacity (a measure of psychomotor integration). She performed in the low average range (19th to 28th percentile) in terms of her attention and concentration, ability to initiate, then persist and complete tasks, and verbal conceptualization. Relative to other adults between ages 80 and 84, her scores indicate either mild or no decline across these areas. Notably, however, the total score (combining the subscale scores) indicated that her overall cognitive functioning is in the borderline range (11th to 18th percentile). That is, while no single cognitive capacity was impaired, the overall measure of cognitive abilities indicated some age-related decline. Nonetheless, the result ruled out the presence of dementia.

**DIAGNOSES:**

F32.8; Other Specified Depressive Disorder (mixed anxiety and depressive features), mild

The examiner used the *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition* (DSM-5; American Psychiatric Association, 2013) in preparing this report.

RE: Glenda Seim  
Cause # 4:21-CR00202-01 SRC

Page 9  
02/01/2022

**RISK ASSESSMENT:**

In the opinion of the examiner to a reasonable degree of psychological certainty, if she were to be granted probation, Ms. Seim would present a very low risk for violent criminality and a low risk for general criminality including recidivism similar to the charged offenses.

Given her gender and age, as well as a history free of violent criminality, Ms. Seim is of **very low** risk for violence. Age and gender are strong predictors of violent behavior when the subject is in excess of 60 years old and female. As well, the absence of repeated or recent violent criminality further reduces the predisposition for such acts. Ms. Seim can be managed adequately under mandatory and standard rules of supervision and will have a continuing decline in her risk as she ages in this ninth decade of life.

Ms. Seim's risk for recidivism related to fraud or identity theft is **low**. Factors that may enhance her risk for similar recidivism include the long-term and repeated nature of her participation in the schemes to deposit and transfer funds that others provided to her. She resisted law enforcement officers who attempted to dissuade her activities, and she had some problems while on pretrial supervision (primarily noncompliance with appointments). She also continues to grieve the emotional connection of the fraudulent relationship.

Factors that diminish the risk for similar recidivism include Ms. Seim's gender and age, the absence of past criminal convictions, the absence of a major mental illness (she has mild anxiety and depression, not psychosis, mania or a brain injury), and the absence of substance abuse. Ms. Seim has a history of a stable second marriage and demonstrates other signs of lifestyle stability (e.g., consistent self-support through employment prior to retirement). In contrast, she has had financial difficulties leading to bankruptcy twice in 27 years. Although Ms. Seim has more positive than negative social supports available, her general social network is small. One factor, age-related cognitive decline, is neutral related to recidivism, but may indicate the need for additional support to avoid technical violations if under supervision.

Supervision reduces risk of recidivism in general, but it is particularly salient in this case given Ms. Seim's vulnerability. In many ways, Ms. Seim was the perfect target for the sophisticated scheme in which she became a participant. She was living a subsistence life, was socially isolated, and had little in the way of meaningful activities to fill her time. When Mr. William located her and began a slow but progressive "long game," Ms. Seim's needs for companionship, meaningful activities, and esteem were met. As he engaged her in thoughtful conversation, played on her desire to help, and built a close "relationship" with her, Ms. Seim fell for him. Mr. William used manipulation based upon coercion to keep her involved (e.g., withdrawing from her when she challenged him) and convinced her she could have a special life with him. Over the years, he formed an "us against them" bond with her (with banks and law enforcement as "them"). This long-term process of attachment and manipulation gave Mr. William incredible influence in Ms. Seim's life. That is why supervision will be particularly effective in this case. A probation officer will have the authority to investigate and disrupt such a relationship if Ms. Seim is again targeted. For example, the officer will be able to search her home, review activity on her phone or other electronics, and interview her about new relationships or contacts by prior perpetrators. Ms. Seim will no longer be able to protect a "special relationship" through omission, and she can be held accountable if she should engage with inappropriate persons. In that way, supervision will mitigate risk through acute intervention.

RE: Glenda Seim
Cause # 4:21-CR00202-01 SRC

Page 10
02/01/2022

**RECOMMENDATIONS FOR DEFENDANT IF GRANTED PROBATION:**

1. Probation should be at least five years in length. Establishing a long term of supervision will provide time for Ms. Seim to establish herself in an approved residence, participate in any required programs, maintain compliance with rules of supervision, and demonstrate her capacity to refrain from resuming online or other relationships that may lead to recidivism. Longer supervision will have a greater mitigating effect on risk.

2. The mandatory conditions of supervision as outlined in the presentence investigation report apply well to Ms. Seim.

3. The standard conditions of probation are generally applicable to this defendant, though she is likely to have some difficulties with transportation. Given the nature of the offense and the limits placed upon her in terms of owning a device capable of Internet use, it will be essential to ensure she still has adequate communication options. Part of what led to the participation in the fraudulent schemes was her isolation and susceptibility to the overtures of the man who initially contacted her. If she is unable to communicate with others and is without social support, her susceptibility to others may become an issue again.

4. Ms. Seim experiences some symptoms of anxiety and depression. These are considered in the special conditions of probation, such that she would be required to participate in a mental health treatment program as supervised by her probation officer and treatment provider. This is an excellent special condition to which the examiner would add consideration of her many medical needs and her age-related cognitive decline. Ensuring that she manages her mental and physical health will improve the likelihood that she complies with the conditions of probation.

The examiner will gladly consider other recommendations.

Respectfully,

*[signature]*

Rick Scott, Ph.D.
Licensed Psychologist

RGS/rs