**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **No. 4:21-CR-00202-SRC** |
| | ) |
| | ) |
| **GLENDA SEIM,** | ) |
| | ) |
| **Defendant.** | ) |

**SENTENCING HEARING**

**BEFORE THE HONORABLE STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

**FEBRUARY 24, 2022**

APPEARANCES:

For Plaintiff:          Tracy L. Berry, Esq.
                        OFFICE OF THE U.S. ATTORNEY
                        111 South 10th Street, 20th Floor
                        St. Louis, MO 63102

For Defendant:          Lucille G. Liggett, Esq.
                        FEDERAL PUBLIC DEFENDER
                        1010 Market Street, Suite 200
                        St. Louis, MO 63101

Reported By:            REAGAN A. FIORINO, RMR, CRR, CSR, CCR
                        Official Court Reporter
                        United States District Court
                        111 South 10th Street
                        St. Louis, MO 63102 | (314)244-7989

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

| | |
|---|---|
| 1 | <u>FEBRUARY 24, 2022</u> |
| 2 | (The proceedings commenced at 1:53 p.m.) |
| 3 | (The following proceedings were held in open court |
| 4 | with the defendant present:) |
| 5 | **THE COURT:**  We are here on the record in the case of |
| 6 | the United States of America v. Glenda Seim, |
| 7 | Docket No. 4:21-CR-202-SRC. |
| 8 | Counsel, please state your appearances for the |
| 9 | record. |
| 10 | **MS. BERRY:**  Tracy Berry for the United States. |
| 11 | **MS. LIGGETT:**  Lucy Liggett for Ms. Seim. |
| 12 | **THE COURT:**  Counsel, you may both remove your masks. |
| 13 | It will make it easier.  You can keep it on if you want.  You |
| 14 | don't have to. |
| 15 | **MS. BERRY:**  Thank you. |
| 16 | **THE COURT:**  It's up to you. |
| 17 | And I see Ms. Seim is here as well.  Good afternoon, |
| 18 | Ms. Seim. |
| 19 | **THE DEFENDANT:**  Good afternoon. |
| 20 | **THE COURT:**  All right.  So we are here for |
| 21 | Ms. Seim's sentencing.  She pled guilty on November 2 of 2021. |
| 22 | And I'm going to have you stand up, Ms. Seim, and |
| 23 | have you sworn in. |
| 24 | |
| 25 | |

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1             (Defendant sworn in by the clerk.)

2             **THE COURT:**  You may be seated.

3             Ms. Seim, I'm going to have you pull that microphone

4    back a little closer to you there, if you can.  There you go.

5    That ought to work.

6             You are under oath and your answers are under

7    penalty of perjury just as they were when you pled guilty.  Do

8    you understand that?

9             **THE DEFENDANT:**  Yes, I do.

10            **THE COURT:**  And when you pled guilty, you pled

11   guilty because you are, in fact, guilty as charged; correct?

12            **THE DEFENDANT:**  Yes.

13            **THE COURT:**  When you pled guilty, you told me you

14   were fully satisfied with the services that Ms. Liggett has

15   performed for you in this case.  Since then have you had

16   enough time to talk with her and have her answer any and all

17   questions you had about the case?

18            **THE DEFENDANT:**  Yes, I have.

19            **THE COURT:**  Do you remain fully satisfied with the

20   services that she has performed for you in this case?

21            **THE DEFENDANT:**  Yes, sir.

22            **THE COURT:**  And, Ms. Berry, have the victims,

23   identifiable victims been provided notice of today's hearing?

24            **MS. LIGGETT:**  They were, Your Honor.  There were

25   letters sent out recently.  And when the Court changed the

1   times, there were new letters sent out.  No one has requested

2   permission to speak to the Court.

3           **THE COURT:**  Very good.

4           So I have reviewed all of the materials available in

5   the Court's CM/ECF system, as well as those letters that were

6   provided to me today before the hearing began.  And I've

7   considered all of the matters in the record as is relevant for

8   purposes of sentencing.

9           The materials I've reviewed include, but are not

10  limited to, those letters, as I mentioned; the guilty plea

11  agreement; the presentence report; the restitution

12  questionnaires; the defendant's motion for a downward variance

13  and the United States' response to that.

14          I will note that the defendant's motion includes the

15  cycle -- psychological report of Rick Scott, Ph.D. and then

16  Dr. Scott's CV was also provided to me.  And then I have a

17  notice from the defendant's counsel about calling Dr. Scott

18  here.  And we have discussed that Dr. Scott would be here

19  available to provide testimony in the event that I had

20  questions.

21          Is that correct, Ms. Liggett?

22          **MS. LIGGETT:**  Yes, Your Honor.  And he is in the

23  courtroom today.

24          **THE COURT:**  Very good.

25          All right.  Welcome, Dr. Scott.  Very good.  Thank

1    you for being here.

2            **MALE SPEAKER:**  Good afternoon.

3            **THE COURT:**  I have also reviewed the United States'

4    sealed supplement.  And, Counsel, do you have any written

5    materials for me to consider today?

6            **MS. LIGGETT:**  No, Your Honor.

7            **MS. BERRY:**  No, Your Honor.

8            **THE COURT:**  And, Ms. Liggett, did you have enough

9    time to read and discuss the presentence report with Ms. Seim?

10           **MS. LIGGETT:**  I did, Your Honor.

11           **THE COURT:**  And do you have any objections to the

12   presentence report?

13           **MS. LIGGETT:**  No, Your Honor.

14           **THE COURT:**  Ms. Seim, have you used any drugs or

15   alcohol within the last 48 hours other than the medications

16   you typically take?

17           **THE DEFENDANT:**  No, sir.

18           **THE COURT:**  We went through at your plea hearing a

19   number of medications that you take and they are also

20   reflected in the presentence report.  So are you still taking

21   all of those medications?

22           **THE DEFENDANT:**  Some of them have expired and I

23   haven't got a chance to get them refilled.  I do have an

24   appointment tomorrow with my primary doctor.

25           **THE COURT:**  So the medications that you are not

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1    taking or that you haven't taken because you haven't refilled

2    them, do they in any way affect your ability to understand or

3    fully appreciate what we are doing here today?

4              **THE DEFENDANT:**  No, sir.

5              **THE COURT:**  And did they at any time affect your

6    ability to understand or communicate with your attorney in

7    this case?

8              **THE DEFENDANT:**  No, sir.

9              **THE COURT:**  And did you read and discuss the

10   presentence report with Ms. Liggett and have a chance to have

11   her answer any and all questions you had about it?

12             **THE DEFENDANT:**  Yes, I have.

13             **THE COURT:**  And Ms. Liggett has told me that you

14   have no objections to the presentence report.  Do you agree

15   with that?

16             **THE DEFENDANT:**  I do.

17             **THE COURT:**  Is there any agreement you think you

18   have about sentencing in this case other than your plea

19   agreement and what has been submitted to me in connection with

20   your plea agreement?

21             **THE DEFENDANT:**  Say that again, please.

22             **THE COURT:**  Certainly.  So I will break it down.  So

23   we have your guilty plea agreement.  You know that, right?

24             **THE DEFENDANT:**  Yes.

25             **THE COURT:**  You read and signed that.  And then

1    there are other documents that have been submitted to me about

2    your sentencing relating to, for example, the public service

3    announcement video that you're involved in.

4          **THE DEFENDANT:**  Yes.

5          **THE COURT:**  And your efforts to work with the

6    prosecution on this and the like.  So you understand all of

7    those -- that information?

8          **THE DEFENDANT:**  Yes, I do.  Yes.

9          **THE COURT:**  So other than that information that's

10   been submitted to me, is there any other agreement you think

11   you have about sentencing in this case?

12         **THE DEFENDANT:**  No.

13         **THE COURT:**  And is there anything you are asking for

14   me to decide other than your sentencing in this case today?

15         **THE DEFENDANT:**  Nothing.

16         **THE COURT:**  At this time we will conduct our Local

17   Rule 13.05 bench conference.  We do this in every case.  It is

18   a sealed record.  It is for the protection of the defendant.

19   So we will go ahead and do that.  And then I suspect we will

20   have some other things we need to continue to talk about, but

21   we will first do the 13.05 for purposes of the record.

22         So we are going to put some headphones on you,

23   Ms. Seim.

24         **THE DEFENDANT:**  Okay.

25         **THE COURT:**  So, Ms. Liggett, if you can assist us

1    with that.  Once we have those on -- Ms. Seim, so once you

2    have those on, your microphone isn't going to work.

3              **THE DEFENDANT:**  Okay.

4              **THE COURT:**  So what I'm going to need you to do is

5    if I ask you a question and you have a yes answer, I'm going

6    to need you to give me a thumbs up.

7              **THE DEFENDANT:**  Okay.

8              **THE COURT:**  If the answer is no, I'm going to need

9    you to shake your head.  Do you understand that?

10             **THE DEFENDANT:**  Yes.

11             **THE COURT:**  Very good.

12             Go ahead, please.

13             **(Pursuant to Local Rule 13.05, a bench conference**

14   **was held on the record and placed under seal, after which the**

15   **following proceedings continued in open court:)**

16             **THE COURT:**  All right.  So we are back on the public

17   record.

18             So, Counsel, I will first say that this case has

19   been very ably litigated.  And I appreciate all of the

20   information that you have provided me in this case and I

21   appreciate the extensive information you have provided me on

22   what I'll call Ms. Seim's, I guess, extraordinary efforts to

23   work with the United States and essentially to try to prevent

24   these types of scams and schemes from happening again.

25             So with all of that, I understand that the -- that

1    you have some issues you would like to present.  Keep in mind

2    I have read everything that you have submitted to me.  But go

3    ahead and I will take argument and allocution.  So you may

4    proceed.

5           And I have -- I will mention again, I have read

6    Dr. Scott's report.  At this time I don't have any specific

7    questions about it, but if any arise as you speak, I will let

8    you know and we can get input from Dr. Scott on that.

9           So you may proceed, Ms. Liggett.

10   **MS. LIGGETT:**  Thank you, Your Honor.

11          Your Honor, the guideline range in this case is the

12   minimum of 37.  And in my motion for a variance, I am

13   requesting a downward variance, in addition to the departure,

14   also a downward variance to a term of five years' probation.

15   And I do agree with the government that should be five years

16   of supervised released probation as opposed to administrative

17   supervision.

18          Your Honor, this case was really incredible in

19   looking at the facts of this case and how long this went on.

20   Truly, it was an incredible case when I began to look at the

21   indictment and the extent and the length of time.  My first

22   thought was how could this happen?  How could this happen to

23   someone for the length of time that it is?  And the

24   government, FBI showing up, mortgage, you know, the mortgage

25   companies, banks, everyone telling her that this was a scam

 1   that she was involved in, how long this could go on despite

 2   all of that.

 3           I think in answering the question is in knowing

 4   Glenda Seim.  That's why I thought it was very important that

 5   she receive a psychological evaluation in this case is to know

 6   Glenda Seim.

 7           When I first met her in March of 2021, I could tell

 8   that she didn't have a lot of trust, did not have a lot of

 9   trust in me.  She didn't have a lot of trust in the FBI.  She

10   just didn't.  She was extremely lonely.  Seemed very isolated

11   in her apartment, despite that she was surrounded by people.

12   She had very few friends.  Real friends.  Good friends.  I

13   know the Court has seen these letters from her friends, but in

14   terms of a large social circle and friends and social

15   activities, it just wasn't there.

16           In reading the psychological evaluation, too, you

17   can see her experiences from the time she was a child to her

18   adulthood throughout her life that I do believe shaped her to

19   be the person that she was.  In childhood she was also

20   isolated; she was bullied; she didn't have a lot of friends.

21   And I think that carried into adulthood.

22           I do believe that she is somebody that really was

23   searching to be loved.  Truly loved and cared about and

24   important in somebody's life.  And that's where I think

25   Facebook came about for her.  It was a platform or a forum to

1  meet people, especially, you know, a boyfriend.

2          And I asked her a lot of questions about Facebook

3  when she put herself out there.  What did you do?  Did you put

4  your picture out there?  Yes, I think so.  Do you know

5  anything about privacy settings?  I don't know what those are.

6          So she put herself out there and immediately the

7  trollers came.  And there was this one particular person who

8  asked the right questions, said all the right things and drew

9  her in.  And he manipulated her with incredible manipulation.

10  He was so clever.  He knew the questions to ask and he knew

11  the answers she gave and he was able to manipulate her,

12  manipulate her so well that she was able to not listen to what

13  other people were telling her about this scam.

14          By the time the FBI showed up, she was years into

15  this, of manipulation and what I think is brainwashing, that

16  she can turn away there an entire community.

17          So in my work with Ms. Seim, I needed to build

18  trust.  And I do that with every client I have.  It's

19  important that they trust.  But I sat down with her in her

20  apartment every two weeks.  I spent hours with her peeling

21  back this scheme and this scam to show her where it was, what

22  happened.

23          There was a moment, Judge, that it came.  And it

24  came when I got to the point where I had victim impact

25  letters, that Ms. Berry did provide me at my request, and also

1   the -- when she could see the fraud that was being committed

2   behind the scenes of this G&D business that she thought was a

3   business that she was setting up so the two of them could have

4   this wonderful life together when he returned from Nigeria.  I

5   saw it happen at that moment.

6           The other thing that I realized at that moment was

7   the grief was going to be incredible for her.  And she didn't

8   have a lot of people to fall back on.  But I could see it in

9   her face that she was grieving the loss of what she thought

10  was the love of her life and realizing that not only was she

11  the victim but she had victimized other people; that there

12  were other people who lost money and other things to these

13  same scammers.

14          Luckily at that time it was about that time that I

15  sent her to see Dr. Scott.  So when she met with Dr. Scott,

16  she had had that realization.  And I think those meetings with

17  her and discussing what happened were very healing for her;

18  that she was able to move through the grief.

19          Today as she sits here, her remorse is incredible;

20  that there are people out there that she doesn't even know

21  that were also scammed and she was a part of it.  She wants to

22  make amends.  She wants to make restitution as best she can.

23  She is not a wealthy woman, but she wants to make restitution

24  during -- for the rest of her life, probably, Your Honor,

25  given the judgment that will be levied against her.

1          I think Dr. Scott's report -- I also asked him to do

2    a risk assessment, in terms of the 3553(a) factors in this

3    case, to address the need to protect the public and deter her

4    from future crimes.  Because I know that is a concern in this

5    case, given the length of time that she was involved in this

6    scheme.  And also a sentence that would protect the public and

7    be just punishment in this case.

8          He found in looking at her age and her health

9    issues, her lack of serious mental health issues in this case,

10   her history and characteristics that the risk of recidivism is

11   low in this case.  Especially if she were on a term of

12   supervised probation, such as supervision, that there will be

13   a probation officer who would look in on her, meet with her,

14   be able to look at her phone, computer, whatever, depending on

15   the conditions the Court would impose.

16         Also, she -- her -- she has no criminal history.

17   She is 81.  She is almost 82 years old.  She has worked hard.

18   She has had a stable life.  She has had two stable marriages.

19   She had a son.  No major mental illness.  No substance abuse

20   issues.  And given her health and her circumstances, that her

21   risk of recidivism would be low in this case.

22         The supervision would have several conditions which

23   would protect the public.  And in terms of deterring her from

24   future crimes, her eyes are wide open today.  She sees the

25   scheme for exactly what it is and she sees how she was a part

1   of this by victimizing others, by turning a blind eye and a

2   deaf ear to the people who tried to tell her differently.

3           She wants to make restitution to the victims.  She

4   is never going to do this again.  When Ms. Berry approached us

5   to do a public service announcement and described what it was

6   to her, she was right on board.  Yes, yes, yes.  Right on

7   board.

8           On a day in November, we went down to the FBI

9   building and she was part of a public service announcement.

10  She knew it was going to be out there.  This was going to be a

11  different type of cooperation than other cooperation.  It was

12  going to be out there in the public view.  And it is.  And I

13  did tell her that.  And we watched it together and I told her

14  how it's being used.  And she feels that this helps her make

15  amends and to help other people not to be victimized and not

16  to be a money mule as she is.

17          So I would ask the Court to vary downward in this

18  case and impose a sentence of five years of probation.  Thank

19  you.

20          **THE COURT:**  Thank you, Ms. Liggett.

21          Ms. Seim, at this time you can tell me anything you

22  would like to tell me to consider in connection with

23  sentencing in this case.  You don't have to, but if you would

24  like to, please go ahead and do so now.

25          **THE DEFENDANT:**  Well, I haven't shed a tear since

1  this all started but I think I'm about to blow up right now.

2        I am so ashamed, embarrassed and sorry for my

3  actions because I didn't listen.  I had people tell me,

4  different people from different walks of life tell me that

5  "you shouldn't be doing what you are doing."  But they didn't

6  understand what I was doing, I didn't think.

7        Anyway, I didn't listen.  And since I didn't listen,

8  I've caused people to have hardships and losses.  And I'm so

9  sorry for that.  Not only that, I'm so sorry because of what

10  it's done for my family.

11        **THE COURT:**  Take a deep breath.  It's okay.

12        **THE DEFENDANT:**  I have caused embarrassment and

13  shame and I'll die of shame to myself because I didn't listen.

14  And that's the only reason I can say that things are like they

15  are today is because I didn't listen and I'm so sorry.  And I

16  know it will never happen again.  And had I known what was

17  going on, it would have stopped in a New York minute.

18        Thank you, Your Honor.

19        **THE COURT:**  Thank you, Ms. Seim.

20        Ms. Berry, I have some questions, but let's start

21  with this.  Whose idea was it to do this video?

22        **MS. BERRY:**  My fault.

23        **THE COURT:**  No, not your fault.  I think it's a

24  brilliant and creative idea to -- as the saying goes -- make

25  lemonade out of lemons.  So I appreciate the creativity and

1  the thought that went into that as a way of making the best

2  out of, frankly, what's a horrible situation.

3         So with that, you may proceed.

4         **MS. BERRY:**  Thank you, Your Honor.

5         You know, I want to start by -- when we announced

6  the public service announcement, we had a press conference at

7  the FBI and we showed the video, and one of the questions that

8  was asked was:  You all usually don't work with criminal

9  defendants in this way.  You know, why now?  And the first

10 thing I said was, "This is an exceptional case."  This is not

11 something that we intend to do -- at least I cannot see

12 another situation where we would do another public service

13 announcement like this.

14        It has had incredible reach.  I checked the YouTube

15 link this morning and there have been over 9200 hits this

16 morning.  That's up like 500 from the week before.  It has

17 been released to be used by the FBI in their training.  It has

18 been released to the elder justice coordinators of which I'm

19 one.  And every single United States Attorney's Office.  It

20 has been released to the Executive Office of U.S. Attorneys.

21 It has flowed to various adult advocacy groups in the

22 St. Louis metropolitan area.

23        And the impact has just been stunning.  We don't

24 know whether or not it's going to -- it has stopped anybody.

25 Because nobody is going to say, well, I don't do this because

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   I saw that PSA.  But what we do know is that I -- well, just

2   as an example, yesterday I was in a meeting with members of

3   the older adult advocacy group in St. Louis.  It's the

4   St. Louis Elder Financial Fraud Multidisciplinary Task Force.

5   We have a really long name.  And one of the advocates who

6   works with older adults said until she saw that PSA, she did

7   not know older adults could get charged.

8            I think to think about it, what Ms. Seim did is no

9   different than what a 30-, 40-, 50-year-old money mule has

10  engaged in.  And, you know, we don't really think twice about

11  charging somebody for that type of offense if they engage in

12  it.

13           What these predators -- and that's what I'm going to

14  call them, the people who manipulated Ms. Seim.  When they are

15  working with older adults, they count on the fact that older

16  adults won't get prosecuted, nothing is going to happen to

17  them, and that they can continue their manipulation until that

18  person runs out of money, until a family member, you know,

19  steps in and takes over conservatorship or until the person

20  passes.

21           By Ms. Seim coming forward and doing this public

22  service announcement and advising everybody that she didn't

23  listen to law enforcement, she didn't listen to bank

24  representatives, she didn't listen to Western Union.  And now

25  she is having to be forced -- because she is -- to listen to

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   Your Honor.  And it helps them to understand that there are

2   penal consequences to the conduct.  It's not just promise to

3   pay the money back and don't do it anymore.

4          So this public service announcement was an unusual

5   ask for a situation that has become all too usual.  It's all

6   too familiar that we have individuals such as Ms. Seim who

7   have been cultivated over a period of years, engaging in

8   conduct that they are repeatedly told is criminal but

9   believing the love of their lives as opposed to family

10  members, as opposed to law enforcement.

11         We have already charged one other individual in this

12  district.  I've talked to prosecutors in other districts, in

13  other federal districts where they have cases involving people

14  like Ms. Seim.  It is our belief that this public service

15  announcement will open the eyes, if not necessarily of older

16  adults who are becoming money mules, but their family members,

17  people in the community who will take it seriously and will do

18  something to stop the fraud from going forward.

19         We have looked at the 3553(a) factors.  In white

20  collar fraud cases it's very difficult to believe that

21  somebody who commits fraud, who their entire career, criminal

22  careers are built on deceit, can come in and say I'm sorry.

23  And so in those cases, we ask for terms of incarceration.

24         This case, however, when considering the totality of

25  the 3553(a) factors, what the government sees as Ms. Seim's

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1    extreme remorse, and knowing that there are options within the

2    United States Probation Office that can reduce any risk of

3    future criminal activity, it is the government's belief that a

4    sentence of probation with restrictions as set forth in the

5    presentence investigation report would be appropriate in this

6    case.

7           **THE COURT:**  Thank you.  Some questions for you.

8           Dr. Scott in his report mentions a number of factors

9    that he believes diminish the risk for Ms. Seim's recidivism

10   in this case.  He lists four.  One, her gender and her age;

11   number two, the absence of past criminal convictions; number

12   three, the absence of a major mental illness and that she

13   simply has mild anxiety and depression, not psychosis, mania

14   or any brain injury; and the absence of substance abuse.

15          He also cites her history of a stable second

16   marriage that demonstrates signs of lifetime -- lifestyle,

17   rather, stability.

18          Tell me what is the United States' position with

19   respect to your perception, the United States' perception of

20   the risks of recidivism in this case.

21          Because I will tell you the one thing that concerns

22   me -- there are a lot of things that concern me about this

23   case, but the one thing that concerns me is that Ms. Seim

24   ignored all of the warning signals, including police, FBI and

25   Secret Service coming to her door and saying -- and the bank

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   and others -- saying what you're engaged in is fraudulent,

2   harming other people and you need to stop.  And she doesn't.

3          And in recognizing what else Dr. Scott and

4   Ms. Liggett have said about Ms. Seim and her susceptibility

5   for a variety of reasons, a concern, valid concern in this

6   case is the risk of recidivism.

7          Please address that.

8          **MS. BERRY:**  Your Honor, I understand completely.

9   It's one of the government's concerns as well.  The factors

10  that Dr. Scott pointed out were weighed to a lesser extent

11  than what Dr. Scott and Ms. Liggett may have done.

12         The issue for the government is fashioning a

13  sentence that will meet all of the sentencing objectives.

14  Deterrence being, for the government, a very, very big one.

15  Protecting the public, a very, very big one.  But for our

16  request for five years of extreme restrictions on her liberty,

17  there might be greater concern.

18         The difference now, or tomorrow, and when all of

19  this took place is that, number one, all eyes were not on

20  Ms. Seim.  Because of this public service announcement, all

21  eyes are on her.  I cannot imagine her being able to walk into

22  another bank, opening another account and fraud investigators

23  immediately seizing ahold of that and contacting the

24  U.S. Attorney's Office, contacting the FBI and putting that

25  before the probation office and this Court.

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1            I cannot imagine that she would be able to receive

2   mail in other people's names at her current apartment complex

3   and someone not immediately calling and saying, hey, I think

4   there's something going on here.  What was going on before was

5   individuals would say something to her, but there wasn't an

6   immediate ability to bring somebody in to -- I hate to use

7   this analogy but "bring down the hammer."

8            There will be, under a term of probation, the

9   difference with regard to incarceration, the concern of the

10  government under that scenario is that supervised release

11  would be limited to three years.  Because of Ms. Seim's age

12  and health conditions, she could seek relief from the Bureau

13  of Prisons for an early release potentially under the --

14          **THE COURT:**  First Step Act.

15          **MS. BERRY:**  Yeah.  FSA.  But I was going to use the

16  wrong letters for that.

17            But there's also the concern that if she were to be

18  incarcerated under the circumstances that there are now, that

19  we might end up in a situation where when she comes out, she's

20  even more isolated.  Right now there have been resources that

21  have been arranged for her through St. Louis Aging Ahead that

22  will give her some of that social outlet that she was seeking

23  from the love of her life.

24            And they are in place now to step up and provide her

25  with just some training.  There's another organization called

1  Oasis that the government will be providing that information

2  to the probation office.  It is an organization for seniors

3  that allows them to come and learn certain skills.  It's

4  computer related.  And so it's going to depend on restrictions

5  on whether she has access to the Internet.  But she could

6  potentially be allowed to do that.

7        So the 3553(a) factors and the fact that overall a

8  term of incarceration would not suit this defendant and these

9  circumstances and truly accomplish all of the goals when a

10  five-year sentence of probation could.

11        **MS. LIGGETT:**  Judge, I know you didn't ask me that

12  question.  May I respond.

13        **THE COURT:**  You read my mind because that was the

14  next question.  So go ahead.

15        **MS. LIGGETT:**  Okay.  In my allocution I wanted to

16  address those issues.  Because this did go on a long time and

17  she didn't listen to the community and then she didn't listen

18  to the FBI.

19        In my allocution, what I wanted to point out to the

20  Court that also seven years ago or eight years ago when she

21  got involved in this, her eyesight was good; she had a car;

22  she was moving around the community; she had a bank account.

23  She was prime to be used in this -- in the way that this

24  depraved individual or individuals wanted her to.

25        Since that time, she is no longer driving.  She

1  really -- she can't -- she can't see.  She's got glaucoma and

2  macular degeneration.  Her eyesight is so poor.  I will let

3  the Court know, I read all of the discovery to her because she

4  just can't read it, she can't see it.  So she is not driving.

5  She has no bank account.  She has no bank account.

6          Her son -- you know, she was kicked out of the

7  senior living apartment she had and her son was able to find

8  her another apartment in Webster Groves.  The mail goes to him

9  now.  She doesn't receive her mail.  She has no computer.  She

10 has no Internet.  If the Court imposes those conditions for

11 the next five years, that would be fine with her.

12          So in terms of protecting the public and that

13 Ms. Seim will never do this again, those particular aspects of

14 her life have changed.

15          What I wanted the Court to know was from the moment

16 I met her, on the 21st or so of March and before that, and who

17 she is today and where she is today, it's a 180-degree turn.

18 180 degrees.

19          At the time that she entered into this, she was so

20 vulnerable.  And she knew nothing about Facebook and trolling

21 and the depravity that was out there.  I mean, I am not a fan

22 of Facebook, and I will yell it from the top of this building:

23 I am not a fan of Facebook.  And this is one of the reasons

24 I'm not.

25          She has done a 180-degree turn.  She is not going to

1   get on the Internet.  She is not going to look for some

2   boyfriend on the Internet.  She is not going to take anybody's

3   suggestion that she should take a piece of equipment to a

4   pawnshop.  She is not going to do that.  The only thing she

5   has is her social security card.  And her son knows all about

6   this and is in her life, watching.

7           So I just want the Court to know that.  Because I

8   have spent over a year with her.  I have had her evaluated.  I

9   don't want her to do this again.  I don't want anybody to do

10  this again.  And for her to get up and do a public service

11  announcement and put herself out there at her age.  The

12  community.  It wasn't -- it wasn't ten minutes from the plea

13  she got a letter evicting her.  I mean, it came so fast it

14  must have been waiting for her at the door.  Out.

15          Her life has changed.  And she is 100-percent aware

16  of what happened and it will not happen again.

17          **THE COURT:**  Thank you.

18          First to our presentence officer, thank you.  Very

19  thorough work.  I appreciate it.  I find it very helpful.  I

20  do have a couple of questions for you.  So from the

21  perspective of the probation office, what is your view on the

22  risk of recidivism in this case with the conditions of

23  supervision that are being proposed?

24          **THE PRESENTENCE OFFICER:**  Yes, Your Honor.

25          **MS. LIGGETT:**  Do you want her to come to the podium,

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   Your Honor.

2            **THE COURT:**   That might be better.

3            **THE PRESENTENCE OFFICER:**   Thank you, Your Honor.

4            I have only spoken with Ms. Seim personally once.  I

5   saw remorse when I spoke with her.  And in talking about the

6   recidivism risks, if she is granted probation, her supervising

7   officer has been briefed and is aware of Ms. Seim and the

8   history and characteristics of Ms. Seim and the kind of unique

9   nature of her being an individual on supervised release or a

10  term of probation.

11           I believe in terms of Ms. Seim's remorse, I think it

12  is genuine.  I agree with the government in that all eyes are

13  on Ms. Seim now in a way that she didn't have before.  And I

14  think in terms -- in terms of positivity, she didn't have

15  anyone looking out for her previously to avoid this entire

16  situation.  Moving forward, she will have the entire probation

17  office looking out for her and her best interests and making

18  sure that she doesn't end up back in this courtroom for any

19  reason whatsoever.

20           I'm trying to think if there's anything else.

21           I would agree with both parties that I don't believe

22  that Ms. Seim is at risk for coming back into this courtroom

23  under similar circumstances.

24           **THE COURT:**   Do you believe there are appropriate

25  support mechanisms in place now that will, I guess in two

1  ways, one, continue to keep all eyes on Ms. Seim and, number

2  two, to be there not to backstop but essentially to be more

3  proactive in a sense?

4        **THE PRESENTENCE OFFICER:**  Sure.  I did write down

5  both Oasis and Aging Ahead.  I'm going to leave a note for her

6  supervising officer.  I'm not sure how aware our office is

7  with those particular resources, given the average age of

8  offenders that are in our office, but it will be a great

9  additional resource to add to the arsenal.

10        I think that proactivity is going to be very

11  important moving forward.  I know that trust is difficult to

12  come by and hard to be earned by Ms. Seim, and I hope that

13  moving forward with her supervising officer she is able to

14  build a relationship with that officer that will allow her to

15  reach out in times of, you know, concern and in moving forward

16  in a proactive manner.

17        I do believe that we have the resources to be

18  proactive in this.

19        **THE COURT:**  Now, if I were to sentence Ms. Seim to a

20  term of probation instead of a term of incarceration, will the

21  probation office actively supervise her for the entire term?

22        **THE PRESENTENCE OFFICER:**  Yes, Your Honor.

23        **THE COURT:**  In terms of access to the Internet,

24  there are a couple of things in that regard.  I received a

25  violation report some weeks ago.  There was some

1   back-and-forth on it about whether Ms. Seim -- she, at the

2   time, possessed one or two smartphones.  There was a question

3   of whether they had access to the Internet or not.  So tell me

4   about that situation.  And then I want to talk about the

5   appropriate conditions with respect to Internet access and

6   smartphones and the like.

7          Because in this case, they are virtue and a vice.

8   Right?  Social media can be a virtue and a vice.  I see the

9   vice of it here.  The flip side of that is the concern that I

10  think all involved have expressed about preventing Ms. Seim

11  from becoming more isolated than she is, kind of backsliding

12  back to where she was or even worse.

13         So tell me what the probation office's view is with

14  respect to Internet access and devices, if you will,

15  computers, smartphones and the like for Ms. Seim on a

16  go-forward basis if I were to sentence her to probation.

17         **THE PRESENTENCE OFFICER:**  My understanding in

18  reference to the phones in particular comes from notes after

19  the fact.  So I'm not sure if Lucy has a better knowledge of

20  it.

21         I am aware of, at this time, Ms. Seim has a new cell

22  phone.  It does not have access to the Internet whatsoever.

23  While on pretrial, Ms. Seim has not been able to access the

24  Internet, has not been able to own a computer or a smartphone.

25  I realize that my report does not include the language for

1   those special conditions.  I did just e-mail them to you, so

2   they are in front of you if you need them.

3         I don't want to speak too much on the incidents that

4   did occur with the previously owned cell phones because I was

5   not involved in the supervision aspect of that.  But I do -- I

6   do believe that at this present time it has been confirmed by

7   pretrial that the phone that she possesses is the only phone

8   she has.  There is no access to the Internet.  She does not

9   own any computers in her home.

10        Should the Court impose the special conditions that

11   have been utilized during pretrial, it will just kind of carry

12   over.  It will remain as it has been for her.  I think that

13   she had a bit of a bumpy start getting situated with the phone

14   and the lack of Internet access, but moving forward, if those

15   conditions were to be imposed and applied, there should be no

16   change to the expectation moving forward for what she's

17   already been doing.

18   **THE COURT:**  Well, thank you.  You anticipated my

19   next question about providing the conditions.  Thank you for

20   that.

21        So, Ms. Liggett and Ms. Seim, I'm going to read

22   these conditions.  These are conditions that will be

23   additional conditions for either a term of supervised release

24   or a probation.  They are not listed in your presentence

25   report.  However, I believe you are familiar with them because

1  they are, as I understand it, current conditions of Ms. Seim's

2  bond and being out on pretrial supervision.

3         I don't think they are anything new.  The only way

4  that they are new is in terms of being specifically tied to

5  going forward from sentencing forward as opposed to up to the

6  point of sentencing.

7         Do you agree with that, Ms. Liggett?

8         **MS. LIGGETT:**  Yes, Your Honor.  I know what

9  conditions you are talking about.

10         **THE COURT:**  All right.  I'm going to read them so,

11  Ms. Seim, you are aware.  And I need you to tell me if you

12  understand each one of these conditions.

13         One is you must not possess and/or use computers as

14  defined under federal law or other electronic communications

15  or data storage devices or media without the written approval

16  of the probation office.

17         Do you understand that?

18         **THE DEFENDANT:**  Yes.

19         **THE COURT:**  And is that a condition you are

20  currently subject to?

21         **THE DEFENDANT:**  Yes.

22         **THE COURT:**  And I'm going to make it the "prior

23  written approval."  So you need advance approval before you

24  would use any of those or possess any of those devices.  You

25  would need the probation officer to okay it, approve it before

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1    you got one.

2              Do you understand that?

3         **THE DEFENDANT:**  Yes, I do.

4         **THE COURT:**  The next one is you must advise the

5    probation office of all computers, electronic equipment and

6    web-enabled equipment, including cell phones, to which you

7    possess or have access within 24 hours of obtaining them.

8              Do you understand that?

9         **THE DEFENDANT:**  Yes.

10        **THE COURT:**  I'm going to change that a little bit.

11   And I'm going to change it to that you have to advise them at

12   your initial meeting with your probation officer of any of

13   that type of equipment that you possess at that time.  Okay?

14             So anything that you have at the time.  So if that

15   initial meeting occurs today, tomorrow, Monday or whenever it

16   occurs, I'm ordering you to make sure you tell the probation

17   officer of everything you have.

18             Do you understand that?

19        **THE DEFENDANT:**  Okay.

20        **THE COURT:**  And then the second way I'm going to

21   change is that you may not obtain any of those items, any more

22   of those items without, again, advanced written approval of

23   your probation officer.

24             Do you understand that?

25        **THE DEFENDANT:**  Yes.

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1           **THE COURT:**  Next is you must not access the Internet

2 except for reasons approved in advance by the probation

3 officer.  Do you understand that?

4           **THE DEFENDANT:**  Yes.

5           **THE COURT:**  And then the next is you must submit

6 your computers -- again, as defined under federal law -- or

7 other electronic communications or data storage devices or

8 media to searches conducted by the probation office.

9           Do you understand that?

10           **THE DEFENDANT:**  Yes.

11           **THE COURT:**  And you are currently subject to some

12 form of all four of those things.  Right?

13           **MS. LIGGETT:**  (Conferring with client).

14           **THE DEFENDANT:**  Yes.

15           **THE COURT:**  Do you understand that?

16           **THE DEFENDANT:**  Yes.

17           **THE COURT:**  And you have had conversations with your

18 pretrial officer about that?

19           **THE DEFENDANT:**  Oh, yes.

20           **THE COURT:**  All right.  Thank you.

21           Ms. Korte, I don't have any further questions for

22 you.  Again, I appreciate all of your work on this.

23           **THE PRESENTENCE OFFICER:**  Thanks, Your Honor.

24           **THE COURT:**  Thank you.

25           **MS. BERRY:**  Your Honor, I just want to say that

1    we've been talking a lot about what other people have done for

2    her.  The defendant's son, once he was made aware, after her

3    indictment, about the extent of the fraudulent conduct, he

4    immediately took steps to, you know, grab her phones, do

5    anything that he possibly could to help.  I think he now has a

6    greater awareness as well.  So in addition to the probation

7    office, we also have her son.

8            **MS. LIGGETT:**  Your Honor, he is on the -- he is on

9    the call.

10           **THE COURT:**  I'm aware.

11           **MS. LIGGETT:**  He is listening to everything.

12           **THE COURT:**  Right.  Right.  Well, I will address

13   Ms. Seim's son in a few minutes.

14           That said, Ms. Berry, are you moving to dismiss --

15           **MS. BERRY:**  Counts 1 and 3.

16           **THE COURT:**  -- a couple of counts in this case?

17           So tell me what is your basis for the finding I need

18   to make that the remaining charges reflect the seriousness of

19   the offense behavior and the dismissal of those counts will

20   not undermine the statutory purposes of sentencing.

21           **MS. BERRY:**  Yes, Your Honor.  Count 3 is simply

22   another identity theft count.  Count 1 is the bank fraud

23   count.  It does carry a higher base offense level, that being

24   seven.  The impact of the plea is that the guideline range is

25   41 to 51 months with that count as opposed to the 37 to

1   46 months that we have now.

2          However, since the government is requesting

3   five years of probation, which is what, you know, five years

4   of supervised release, what she would have gotten with that

5   count, there is no difference.  There is no meaningful

6   difference in the recommendation because we are asking

7   five years of supervised probation.

8          **THE COURT:**  Understood.  All right.

9          So moving forward here.  I do accept the parties'

10  plea agreement.  And with respect to the dismissal of Counts 1

11  and 3, Count 1, I think there's minor impact on the guidelines

12  range and Count 3 there's no impact on the guidelines range.

13         I often have lawyers come into my courtroom and tell

14  me this is a really unique case.  These are really unique

15  facts.  And on these facts, you ought to depart very

16  significantly from the guidelines range or the like.  Frankly,

17  rarely is that true.  There's what is referred to in the case

18  law by the Supreme Court as the heartland of cases that the

19  guidelines address, and the guidelines do address, as the

20  Supreme Court has found, the "heartland of cases."

21         This case, however, is truly a unique case.  And so

22  on these facts and this truly unique case, the overall impact

23  with the defendant's cooperation, Ms. Seim's production of

24  this public service announcement video, her public acceptance

25  of responsibility, they play an outsized role in my

1    determination in this case.

2            I often have defendants come in and tell me they are

3    sorry.  They apologize to me.  They apologize to everyone

4    under the sun.  And they promise me they will never do it

5    again.  And that they will do everything they can to make it

6    right.  I see many of those defendants back here on supervised

7    release violations.  So there's what you say and what you do.

8    Here what Ms. Seim did, in terms of the public service

9    announcement, is quantitatively and qualitatively different

10   from the typical cooperation.

11           And so for those reasons, I find that the remaining

12   charges reflect the -- adequately reflect the seriousness of

13   the offense behavior and accepting the guilty plea agreement

14   will not undermine the statutory purposes of sentencing.

15           With that, I do adopt the guidelines calculations

16   that are set forth in the presentence report and those are as

17   follows.  These are the advisory guidelines ranges.

18           Total offense level is 21.  Criminal history

19   category is one.  That results in a guidelines range of 37 to

20   46 months' term of incarceration.  The supervised release

21   range on Counts 2 and 4, one to three years.  Ms. Seim would

22   be ineligible for probation under the guidelines; however,

23   that does not make her legally ineligible.  She remains

24   legally eligible for probation.

25           The fine range is 15,000 to $150,000.  The amount of

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   restitution in this case is a substantial amount for a woman

2   of Ms. Seim's age and means, $32,454.16.  And the special

3   assessment is $200, 100 per each of the two counts of

4   conviction.

5         So with that, I further adopt the presentence report

6   as my findings of fact and conclusions of law regarding the

7   advisory guidelines.

8         Counsel, are there any objections to these findings,

9   conclusions or calculations for the record or any other

10  errors, corrections or objections not previously made?

11        Ms. Liggett.

12        **MS. LIGGETT:**  No, Your Honor.

13        **THE COURT:**  And Ms. Berry.

14        **MS. BERRY:**  No, Your Honor.

15        **THE COURT:**  Are there any legal objections to

16  imposing sentence at this time?

17        **MS. LIGGETT:**  No, Your Honor.

18        **MS. BERRY:**  No, Your Honor.

19        **THE COURT:**  So in addition to the advisory

20  guidelines and the policy statements, I have considered the

21  nature and circumstances of the offense which we have talked

22  about a fair amount.  I will talk about it a little more in a

23  moment.

24        The history and characteristics of Ms. Seim, which

25  we've talked about a fair amount as well.  And Dr. Scott has

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   very ably provided that information and Ms. Liggett has

2   provided a very -- ably provided that information as well.

3   And I will talk about that a little bit more.

4         I've also considered the need to avoid unwarranted

5   sentencing disparities among similarly-situated defendants and

6   the types of sentence available.  And in this case, looking at

7   the types of sentence available is something that because of,

8   as I say, the truly unique circumstances of this case,

9   something that I've given a great deal of thought to, as have

10  obviously the attorneys in this case, and that they have

11  provided me tremendous assistance in this regard.

12        So with respect to the offense conduct.  So the

13  record is clear, I mean, this case involves Ms. Seim being

14  preyed upon.  There's no question about that.  There are basic

15  human needs.  Right?  There's the need for nutrition,

16  hydration, shelter.  I think in a fundamental level there's a

17  need for love.  And I think that the scammers in this case

18  honed right in on that fundamental need and preyed upon

19  Ms. Seim for that.

20        The flip side of that is Ms. Seim allowed this to go

21  on for an awfully long time in the face of multiple warnings.

22  As is said in the presentence report, "despite several

23  warnings from banking institutions, local police agencies and

24  federal agencies, Ms. Seim continued to act as a money mule

25  for an unknown individual over the course of five years

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   resulting in intended loss of at least $550,000 and less than

2   $1.5 million."

3         Ms. Seim was advised that she was no longer able to

4   use the services of MoneyGram due to the fact that the money

5   she was receiving was part of a fraud- -- and sending was part

6   of a fraudulent scheme.  She attempted and did deposit a

7   fraudulent check.  Her bank account was subsequently closed

8   after bank representatives told her that she was involved in

9   fraudulent activity.

10        The first bank deemed an account she opened

11   suspicious and closed the account.  There was a check in the

12   amount of $149,900 that was returned by a bank to J Kendell

13   Autos, I think the payor on that check, because it was

14   fraudulent.  TBK Bank sent an indemnification agreement

15   requesting that another bank block access to the funds because

16   they were received into Ms. Seim's account fraudulently.  The

17   Small Business Administration declined a loan that Ms. Seim

18   attempted to take out and did not deposit any funds into her

19   account.

20        Ms. Seim would use false names to protect her

21   paramour and ignore -- continued to ignore these warnings.

22        That conduct is troubling.  It's very troubling.

23   And, I mean, it reflects two things at a fundamental level:

24   One is the sophistication and manipulation of the schemer,

25   William; and, number two, it reflects Ms. Seim's

1   susceptibility to that and her hardening, kind of, to the

2   outside world of the warnings that were provided to her.

3         So the other aspect or another aspect of this case

4   that hasn't been mentioned here today yet is that Ms. Seim was

5   only personally benefiting financially to a very small amount.

6   She wasn't -- she was a money mule for hundreds of thousands

7   of dollars as we discussed.  But in terms of what she put into

8   her own pocket -- and as we know from the presentence report,

9   she is not a woman of significant financial means.  She is

10  living on social security.  She wasn't pocketing money.  She

11  wasn't living a lavish lifestyle.

12        Oftentimes in cases involving embezzlement of funds,

13  I see where people are lining their own pocket.  They are

14  purchasing all sorts of vehicles.  They are living a lavish

15  lifestyle.  They are going on extravagant trips out of the

16  country or exotic destinations.  There was none of that here.

17        And, again, when I say this is truly a unique case,

18  this is one of the aspects that makes this a truly unique

19  case.

20        Ms. Seim is 81 years old.  She has no prior criminal

21  convictions.  Having sentenced somewhere over 200 people in

22  the last two and a half years, the number of people I've seen

23  that come before me that have no criminal history at all is

24  very, very, very small.  Probably I can count it on two hands

25  max, maybe one hand.  And most of those people are

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   substantially younger, maybe a fraction of Ms. Seim's age.

2   Very rare.

3         Ms. Seim also has no history of substance abuse.

4   Again, same thing as with criminal history.  It's very, very

5   rare to see someone come before me who has no history of

6   substance abuse.

7         I have considered Ms. Seim's medical conditions

8   which are extensive.  They are laid out in paragraph 53 of the

9   presentence report.  I'm not going to repeat them all.  I have

10  considered all of them.  They are laid out in Dr. Scott's

11  report as well.

12        I have considered Ms. Seim's mental and emotional

13  health, which is set forth in paragraphs 54 through 57 of the

14  presentence report.  Again, Dr. Scott's evaluation, which is

15  Docket 54, and the four factors he believes are for diminished

16  risk of recidivism.  We have talked about that.  We have

17  talked about that with Ms. Korte as well and Ms. Berry, and I

18  think there is really a combination of factors at work here

19  and things in place now to prevent recidivism and really do so

20  proactively.

21        Ms. Seim has had what I consider an exceptional,

22  tangible, lasting acceptance of responsibility that will

23  continue, we hope, to help others.  We will never know, as

24  Ms. Berry said, whether it prevents anybody.  But the more

25  it's viewed, the more it's available, the more it's

1  distributed, the more likely it is that it will prevent

2  others.  That is, as I say, a very exceptional, tangible and

3  lasting effect to help prevent others from engaging in the

4  crimes that Ms. Seim committed.

5           And in considering the sentence in this case, I have

6  to consider a number of factors that we have discussed, that

7  we discussed at the plea hearing, including the purposes of --

8  primary purposes of sentencing of retribution, deterrence,

9  incapacitation and rehabilitation.

10          Essentially that's making sure you pay your debt to

11 society.  Making sure we prevent others and do the best we can

12 to prevent others from doing what you did.  And putting you in

13 a position where we are preventing you from being able to do

14 that.  And providing you the support you need to rehabilitate

15 you to prevent you from doing this again.

16          So I've arrived at a sentence that is sufficient but

17 not greater than necessary to comply with the purposes of

18 federal law in sentencing -- 18, United States Code,

19 Section 3553(a).  So with that, I do grant the United States'

20 motion for a downward departure.  I find that Ms. Seim's

21 cooperation and assistance, as I said, is quite extraordinary

22 and very far beyond the usual in this case.

23          I grant the defendant's motion for a downward

24 variance in this case as well.

25          So with that, I impose sentence under the Sentencing

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1    Reform Act of 1984 and the provisions of 18, United States

2    Code, Section 3553(a) as follows:

3            It's my judgment that you, Ms. Glenda Seim, are

4    hereby placed on probation for a term of five years with

5    intensive and active supervision.

6            It consists of a term of five years on each of

7    Counts 2 and 4, and these terms will run concurrently; that

8    is, with each other.

9            I do order you to pay restitution pursuant to 18,

10   United States Code, Section 3663(a) for each of Counts 2 and 4

11   in the amount of $32,454.16 to the following victims:  Patriot

12   Credit Union, whose address is in the record here, at $250.65;

13   TBK Bank, also address in the record, in the amount of

14   $24,813.51; XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX $2,170;

15   XXXXXXXXXXXXXXXXX -- I'm sorry.

16           I'm going to strike that from the record, the name I

17   just read, the two names I just read.  Those are nonpublic

18   victims.  But the amounts are 2170; $2000; 2,670; and $550.

19           The payments of the restitution must be made to the

20   Clerk of Court for transfer to the victims.  The interest

21   requirement for the restitution is waived.

22           All criminal monetary penalties are due in full

23   immediately.  If you cannot pay in full immediately, then you

24   must make payments in monthly installments of at least $150 or

25   no less than ten percent of your gross earnings, whichever is

 1   greater, with payments to begin no later than 30 days from

 2   today's date.

 3         Until all criminal monetary penalties are paid in

 4   full, you must notify the Court and this district's United

 5   States Attorney's Office Financial Litigation Unit of any

 6   material changes in your economic circumstances that might

 7   affect your ability to pay criminal monetary penalties and of

 8   any change of your mailing or residence address that occurs

 9   while any portion of the criminal monetary penalties remains

10   unpaid.

11         The mandatory conditions of supervision are set

12   forth in paragraph 104.  The standard are set forth in

13   paragraph 105 of the presentence report.

14         Ms. Liggett, do you waive reading of those?

15         **MS. LIGGETT:**  Yes, I do, Your Honor.

16         **THE COURT:**  The special conditions of supervision

17   are set forth in paragraph 106 of the presentence report, as

18   well as those that I read on the record earlier here during

19   the hearing.  The justification for them is set forth in

20   paragraph 106 as well as in the presentence report generally.

21         Do you also waive reading of those?

22         **MS. LIGGETT:**  Yes, Your Honor.

23         **THE COURT:**  I will summarize those that I have not

24   already read.  So these are additional conditions of your

25   probation that you have to comply with.

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

```
 1              Do you understand that?
 2              THE DEFENDANT:  Yes.  Yes, Your Honor.
 3              THE COURT:  I'm going to briefly summarize them.
 4              You must participate in a mental health treatment
 5   program.
 6              You must submit your person, property, house,
 7   residence, vehicle, papers, computers, other electronic
 8   equipment and data storage devices and media and offices to
 9   searches conducted by the United States probation officers.
10              You must pay the financial penalty in accordance
11   with the Schedule of Payments sheet of the judgment that I
12   enter.
13              You must provide the probation officer with access
14   to any requested financial information and authorize the
15   release of that information.  And the probation office may
16   share that information with the United States Attorney's
17   Office.
18              You must not incur any new credit charges or open
19   any additional lines of credit without the approval of the
20   probation officer.  You must apply all monies received from
21   any anticipated or unexpected financial gains -- such as tax
22   refunds, inheritances or judgments -- to the outstanding court
23   ordered financial obligation, the restitution and the special
24   assessment.  You must immediately notify the probation office
25   of your receipt of any of those types of monies.
```

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1          You must also complete 50 hours -- 5-0 hours -- of

2    community service and provide written verification of that

3    community service to the probation officer.

4          I do find that you do not have the ability to pay a

5    fine so I waive the fine in this case, but I do impose a

6    special assessment of $100 per count for a total of $200,

7    which is due and payable immediately.

8          I do further order forfeiture of all items seized by

9    law enforcement in connection with the investigation and

10   prosecution of this case.

11         Now I'm going to notify you, Ms. Seim, of your right

12   to appeal.

13         You can appeal your conviction if you believe that

14   your guilty plea was somehow unlawful or involuntary or if

15   there's some other fundamental defect in the proceedings that

16   was not waived by your guilty plea.

17         Under some circumstances, a defendant also has the

18   right to appeal the sentence itself but may enter into a plea

19   agreement that waives some or all of those rights.  You have

20   entered into a plea agreement that waives some or all of your

21   right to appeal the sentence itself.  These waivers are

22   generally enforceable, but if you believe that the waiver

23   itself is somehow invalid or unenforceable, you can present

24   that theory to the Court of Appeals.

25         Any notice of appeal you file must be filed within

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1   14 days of the entry of judgment by the Court or within

2   14 days of the filing of a notice of appeal by the United

3   States.

4           If you request, the Clerk of Court can and will

5   prepare and file a notice of appeal on your behalf.  If you

6   cannot afford to pay the filing fee on appeal or for an

7   attorney on appeal, you may apply to have the filing fee

8   waived and to have an attorney appointed for you on appeal.

9           I instruct Ms. Liggett to review with Ms. Seim her

10  appeal rights and promptly file the form in compliance with

11  Local Rule 12.07.

12          Counsel, do you have any objections to the sentence

13  for the record?

14          **MS. LIGGETT:**  No, Your Honor.

15          **MS. BERRY:**  No, Your Honor.

16          **THE COURT:**  Counsel, is there anything further we

17  need to address before I address a few words to Ms. Seim and

18  also to her son?

19          **MS. LIGGETT:**  No, Your Honor.  Thank you.

20          **MS. BERRY:**  No, Your Honor.  Thank you.

21          **THE COURT:**  Ms. Seim, you can talk to Ms. Liggett in

22  a moment.

23          As I said, this is a truly unique case.  And your

24  sentence in this case I intend to be, frankly, both hard and

25  helpful.  I don't expect probation to be easy for you, but I

1    also expect it to be helpful to you.  You must pay your debt

2    to society for the wrongs you have committed here and those

3    you harmed.

4            But, also, I think that the probation office can

5    help you a great deal and all of the resources that Ms. Berry

6    has provided to the probation office.  And all of the other

7    resources that have been put in place for you, including your

8    son, including the mail going to your son, including the

9    people in your apartment complex being aware of your

10   situation.  Ms. Berry said it well when she said all eyes are

11   on you.  And they are.  My eyes will continue to be on you.

12           Your probation officer will provide me reports of

13   any violations you have of your terms and conditions of

14   probation so I will know about them.  I will know about them

15   pretty soon after they happen.  I will read them.  I will pay

16   very careful and close attention to them.

17           If you violate your terms of probation, it's very

18   likely that you are going to be back here before me in my

19   courtroom and we may be talking about other types of penalties

20   for you.  Those would include a term of incarceration in the

21   Bureau of Prisons.  Time in prison.

22           So I encourage you to work closely with your

23   probation officer.  You are going to need to develop a

24   trusting relationship with your probation officer.  One thing

25   I tell virtually every defendant that I see at the time of

1   sentencing is that the probation officer is there to help you.

2   Your probation officer wants to see you succeed.

3          The way that happens is if you work with your

4   probation officer.  If you work against your probation

5   officer, you make it awfully difficult for them to help you

6   succeed.  So you need to work with your probation officer all

7   the time.

8          Do you understand that?

9          **THE DEFENDANT:**  Yes, I do, sir.

10         **THE COURT:**  Now, your son is here on the line.  I'm

11   going to address these words to him.

12         You are now aware of what your mother has been

13   involved in, what she was victim of, what she participated in

14   and I thank you for the assistance you provided since you have

15   become aware of this.  I encourage you to continue to provide

16   that kind of assistance, to provide that close connection and

17   to provide monitoring, if you will.  I think that will help.

18   I think that will help your mother.

19         I can't tell a son to love his mother, but I will

20   tell you I do think that a big issue here is that fundamental

21   human need to be loved.  And I think you can play a special

22   role in that.  Certainly I will leave that up to you how you

23   manifest that in your conduct with your mother, but I

24   encourage you to keep that in mind and move forward

25   accordingly.

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

1          With that, is there anything further we need to

2   address?

3          **MS. LIGGETT:**  No, Your Honor.  Thank you.

4          **MS. BERRY:**  No, Your Honor.  Thank you.

5          **THE COURT:**  Thank you all very much.  I really

6   appreciate the fine manner in which you have handled this case

7   in the creative way that you have come up with, Ms. Berry, for

8   resolving this case.  And I hope that it is of great benefit

9   going forward.  And if there's anything that I can do to help

10  with the benefit of going forward, please let me know.  I'm

11  happy to do that.

12         **MS. BERRY:**  You may regret saying that.

13         **THE COURT:**  That wouldn't be a real bad regret

14  really.  So thank you all very much.

15         With that, Court is adjourned.

16          (The proceedings concluded at 3:07 p.m.)

17

18

19

20

21

22

23

24

25

*USA v. Glenda Seim | 4:21-CR-00202-SRC*

CERTIFICATE


        I, Reagan A. Fiorino, Registered Merit Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

        I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

        I further certify that this transcript contains
pages 1 through 48 inclusive and was delivered electronically
and that this reporter takes no responsibility for missing or
damaged pages of this transcript when same transcript is
copied by any party other than this reporter.

        Dated at St. Louis, Missouri, this 11th day of
March, 2022.




                        */s/ Reagan A. Fiorino*
                        Reagan A. Fiorino, RDR, CRR, CRC, CCR
                        Official Court Reporter